[Nos. 62505-5-I; 62801-1-I.   Division One.   January 25, 2010.]

BARBARA COREY, *Respondent*, v. PIERCE COUNTY ET AL., *Appellants.*

754

*Catherine W. Smith* and *Howard M. Goodfriend* (of *Edwards Sieh Smith & Goodfriend PS*); *Joanne Henry* (of *Sloan Bobrick PS*); and *John A. Miller* (of *Miller Quinlan and Auter*), for appellants.

*Philip A. Talmadge* and *Sidney C. Tribe* (of *Talmadge/Fitzpatrick*), for respondent.

¶1 APPELWICK, J. — Pierce County (County) appeals a jury verdict in favor of Corey on claims of wrongful termination, defamation, false light, outrage, and negligent dissemination of unsubstantiated information. The County asserts that Corey was an at will employee, that no cause of action exists for negligent dissemination of unsubstantiated information, and that the evidence does not support the intentional tort claims. The County also challenges the exclusion of disparaging evidence about Corey. Corey cross-claims the denial of her motion for attorney fees as untimely. We agree that no cause of action lies for negligent dissemination of unsubstantiated information. However, striking that cause of action will not affect the judgment. We affirm in all other respects.

## FACTS

¶2 Plaintiff Barbara Corey worked for the Pierce County Prosecuting Attorney's Office (PCPA) for 20 years. While working as a deputy prosecuting attorney, Corey coorganized a guild to negotiate conditions of employment for deputy prosecuting attorneys, including just cause termination. Gerry Horne became the Pierce County prosecuting attorney in 2001 and appointed Corey to be his assistant chief criminal deputy prosecuting attorney. Corey served as the third highest ranking deputy prosecutor in the county. Assistant chief deputy prosecuting attorneys are not members of the guild or covered by the collective bargaining agreement. But, Corey testified that before she accepted the assistant chief criminal deputy position, Horne promised her the just cause termination benefit enjoyed by guild members. Corey maintains that she would not have taken the position were it not for Horne's promise, as she did not want her employment to be "subject to the vagaries of Pierce County politics."

¶3 In December 2003, Corey expressed concerns about John Neeb, a prosecutor in the sexual assault unit, to administrative deputy Dawn Farina. In early January 2004, Corey recommended to Farina that Neeb be transferred out of the felony division. Ultimately, Horne had authority to make the transfer. The parties' accounts of Corey's discussions with Neeb vary dramatically. Corey maintains that Horne and Farina asked her to announce the transfer to Neeb, asking her to put a positive spin on it. Corey then told Neeb. PCPA maintains that Horne initially approved the transfer, but that he rescinded it after Horne discovered that Corey's communication with Neeb about the basis of the transfer was inaccurate.

¶4 Horne testified that he then lost confidence in Corey. On January 27, 2004, Horne summoned Corey to his office. He questioned her about what she had told Neeb and others about the transfer. Corey defended herself and recounted

her story. On January 28, Corey was again summoned to Horne's office. She asked Horne if she needed to have someone with her. Horne told Corey he was dismissing her. Horne gave Corey 40 minutes to resign in lieu of termination or be fired. Corey resigned effective March 19, 2004, to utilize compensatory time and personal holidays.

¶5 In Corey's desk drawer, Horne's investigator found an envelope Corey had used to collect private donations for a colleague whose child was ill. Corey had not yet purchased the gifts, but did so shortly after resigning. Some at the PCPA were still concerned that some of the money raised might be unaccounted for. A PCPA investigator looked into the matter. At the end of February, one of Horne's investigators met with Horne and informed him there was no viable case to pursue against Corey. Corey maintains that Horne's office leaked to the *Tacoma News Tribune* (TNT) that there was an internal investigation of missing funds involving Corey.

¶6 The TNT published an article about Corey's departure. Karen Hucks, *Senior Deputy Prosecutor Quits*, TACOMA NEWS TRIB., Jan. 30, 2004, at B1. Two additional stories by the same reporter appeared on March 5 and 6, 2004. Karen Hucks, *How a Deputy Prosecutor Lost Her Job*, TACOMA NEWS TRIB., Mar. 5, 2004, at B1; Karen Hucks, *Prosecutor Fires Aide*, TACOMA NEWS TRIB., Mar. 6, 2004, at A1. The March 5 story reported on the circumstances surrounding Corey's resignation, including Corey's contention that Horne "set her up" by telling her to put a positive spin on the Neeb transfer, and extensive criticism of Horne and his reasons for seeking her resignation. Hucks (Mar. 5, 2004), *supra*, at B1. The article also quoted Horne as saying that he had lost confidence in Corey's ability to speak for him and the office, and that when called upon, one has to tell the truth. Hucks (Mar. 5, 2004), *supra*, at B1. Horne claimed that Corey had "put it on her fellow employees, and to me that's one of the most despicable things a person can do." Hucks (Mar. 5, 2004), *supra*, at B1. Horne terminated Corey, effective immediately, on March 5, 2004.

¶7 On March 6, 2004, an article appeared in which Horne stated that Corey was an at will employee and he needed no cause to fire her. Hucks (Mar. 6, 2004), *supra*, at A1. The article contained a number of other statements from Horne, including the claim that Corey was subject to a "pending criminal investigation into whether money was mishandled in his office." Hucks (Mar. 6, 2004), *supra*, at A12. Horne also claimed in the article that Corey had "told several lies" in connection with the Neeb transfer. Hucks (Mar. 6, 2004), *supra*, at A1.

¶8 Corey testified that the article devastated her emotionally and professionally. She subsequently suffered severe depression, at one point was suicidal, and experienced an onset of epileptic seizures. It also prevented her from obtaining another position. Corey sued Horne and the County for invasion of privacy, defamation, defamation by implication, false light, outrage, intentional or negligent infliction of emotional distress, and breach of a contract formed by promissory estoppel.

¶9 Corey retained two experts, Professors Larry Echohawk and David Boerner, to inform the jury about the standard of care with respect to her invasion of privacy claim. Specifically, they were to address the role of prosecutors as ministers of justice and their responsibilities with respect to ongoing criminal investigations. The County moved to exclude the expert testimony, arguing that the question of whether there was a violation of an ethical rule is one of law, not fact, and that the rules of professional conduct cannot be the basis for a civil action. The trial court granted the County's motion in part and denied it in part. It allowed only one expert to testify as to matters within his expertise that may be relevant to issue in the case. It prohibited opinions on questions of law, credibility of witnesses, "standards of care or conduct" of prosecutors, or existence, applicability, or violations of ethical rules.

¶10 At the end of Corey's case in chief and again posttrial, the County moved for judgment as a matter of law under CR 50 on all issues. The County argued against the

existence of the negligence claim, but the trial court concluded that a cause of action exists in Washington for negligent dissemination of confidential information, specifically the disclosure of unsubstantiated allegations. The County also argued that Corey had not met her burden on any of her intentional tort claims, and that promissory estoppel did not apply to provide Corey a basis for her wrongful termination claim. The trial court denied the County's motions.

¶11 After a three week trial, the jury returned a verdict in her favor. In a special verdict, the jury found for plaintiff on each of her theories, awarding $1,500,000 for "Damage to Reputation," $750,000 in noneconomic damages, $700,176 in economic damages, and $124,994 in "actual damages" on the promissory estoppel claim.

¶12 Corey moved for an award of attorney fees under RCW 49.48.030. The County moved to strike the request, arguing that it was untimely. The trial court granted the motion and denied her fee request as untimely under CR 54(d)(2). The County and the PCPA appeal. Corey cross-appeals the trial court's denial of her motion for attorney fees on her promissory estoppel employment claim.

## DISCUSSION

### I. Intentional Torts

¶13 Before the case went to the jury and after the verdict, the County moved under CR 50 for judgment as a matter of law on all claims. The trial court denied these motions. The County appeals the trial court's refusal to grant the CR 50 motions on the intentional torts of defamation, defamation by implication, false light, and outrage.

¶14 A judgment as a matter of law is appropriate only when no substantial evidence or reasonable inference would sustain a verdict for the nonmoving party. *Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 915, 32 P.3d 250 (2001). " 'Such a motion can be granted only when it can be said, as a matter of law, that there is no competent

and substantial evidence upon which the verdict can rest.' " *Id.* (quoting *State v. Hall*, 74 Wn.2d 726, 727, 446 P.2d 323 (1968)). "Substantial evidence" is evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise. *Id.* The evidence must be viewed favorably to the nonmoving party. *Id.* In reviewing a decision on a motion for a judgment as a matter of law, an appellate court applies the same standard as the trial court.[1] *Id.*

A. Defamation, Defamation by Implication, and False Light Claims

¶15 Corey's claims of defamation, defamation by implication, and false light went to the jury. Defamation is concerned with compensating the injured party for damage to reputation. *Eastwood v. Cascade Broad. Co.*, 106 Wn.2d 466, 471, 722 P.2d 1295 (1986). Defamation requires that a plaintiff prove falsity, an unprivileged communication, fault, and damages. *Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005). Defamation by implication occurs when " 'the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts.' " *Id.* at 823 (quoting PROSSER AND KEETON ON THE LAW OF TORTS § 116, at 117 (W. Page Keeton ed., 5th ed. Supp. 1988)). For defamation by implication, a plaintiff must prove all elements of defamation, including that a statement is provably false—because it either is a false statement or leaves a false

---

[1] In its motion for reconsideration, the County argues we failed to fulfill our constitutional duty to conduct an independent examination of the record to determine whether it establishes actual malice with convincing clarity. *Richmond v. Thompson*, 130 Wn.2d 368, 388, 922 P.2d 1343 (1996), requires that "[i]n reviewing a defamation case on appeal . . . this court must make an independent examination of the record to determine whether there is sufficient evidence of actual malice." We agree *Richmond* is the standard of review for an actual malice finding in a defamation case. However, the County did not address the jury verdict or the constitutional standard of review of the jury verdict in either its opening brief or its reply brief. Instead, it challenged the correctness of the denial of the motions for judgment as a matter of law. The assignments of error may be broad enough to encompass a challenge to the verdict itself, but that is not how the case was argued to this court. We review the propriety of the denial of its motions for judgment as a matter of law under the more deferential standard in *Guijosa*. 144 Wn.2d at 915. *Richmond* does not apply to review of CR 50 motions.

impression. *Id.* at 825. Furthermore, as a public figure, Corey must prove that the defendant made the defamatory statements with actual malice. *Herron v. KING Broad. Co.*, 109 Wn.2d 514, 523, 746 P.2d 295 (1987). "Actual malice" is knowledge of or reckless disregard for the falsity of the statement. *Id.*

¶16 False light differs from defamation in that it focuses on compensation for mental suffering, rather than reputation. *Eastwood*, 106 Wn.2d at 471. A false light claim arises when "someone publicizes a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed." *Id.* at 470-71. So, like defamation, false light claims require a showing of falsity and knowledge of, or reckless disregard for, that falsity.

¶17 The County contends that Corey failed to establish either falsity or malice. The trial court outlined its reasoning behind submitting the defamation and false light claims to the jury.

> I believe that there is sufficient evidence upon which . . . a reasonable jury could find for Ms. Corey. If, for example, the jury believes that . . . there were no financial improprieties committed by Ms. Corey, that the County knew that its investigation was not viable, that the fact of the investigation was leaked to the press for the purpose of harming Ms. Corey's reputation, that, I think could establish the malice element and the jury could find for Ms. Corey on these claims.

Indeed, Corey presented evidence that Horne knew by the end of February that the internal investigation had not revealed actionable improper conduct. Evidence showed that the investigator believed that the investigation was not viable. Yet, Horne's statements to the TNT were published March 5th and 6th, after the investigation had proved fruitless. If the jury believed the testimony, there was evidence that Horne's statements were false and that he knew of their falsity at the time they were made. Horne's

knowledge of the falsity of his statements also satisfies the "reckless disregard" for falsity required to prove actual malice. *Herron*, 109 Wn.2d at 523. Furthermore, Professor Echohawk's testimony established that there was a substantial deviation between Horne's disclosures to the press and national and county prosecutorial ethics standards. The jury could also rely on this evidence to conclude that Horne acted with actual malice when he made his statements to the press despite the known ethical considerations.

¶18 Given the evidence presented and the stringent requirements for a judgment as a matter of law, the trial court did not err in sending the defamation and false light claims to the jury.

## B. Outrage Claim

¶19 The elements of the tort of outrage are extreme and outrageous conduct, intentional or reckless infliction of emotional distress, and resulting severe emotional distress. *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989). The conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975) (emphasis omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). The court must initially determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability. *Dicomes*, 113 Wn.2d at 630. Then the determination of whether the conduct is sufficiently outrageous becomes a question for the jury. *Id.*

¶20 At the close of evidence, the trial court ruled that Corey could not proceed on her outrage claim based on the termination of her employment. The court instructed the jury that the outrage claim did not apply to the resignation/termination but "can be considered for all other actions by Defendants." According to the County, the only other actions complained of are the investigation into the missing donations and statements reported in the two March news-

paper articles. The County asserts that neither action supports an outrage claim.

¶21 The County relies on *Dicomes*, claiming that the Supreme Court ruled as a matter of law that even an allegation that the defendant employer had created an intentionally false report for the sole purpose of embarrassing and humiliating the plaintiff was not sufficient to make out a prima facie case of outrage. But, this does not accurately portray the statements in *Dicomes*. The court concluded that "mere insults and indignities, such as causing embarrassment or humiliation, will not support imposition of liability on a claim of outrage," and that "[a]t worst, plaintiff's allegations amount to a showing of bad faith." 113 Wn.2d at 630-31. Dicomes did not establish sufficiently outrageous behavior to warrant liability. *Id.* at 631.

¶22 Here, Corey presented evidence that Horne had essentially publically accused her of criminal behavior despite knowledge that an internal investigation revealed little of substance. Furthermore, he implied that she mishandled public funds, rather than private donations. As a prosecutor and longtime public servant, such allegations would be particularly loathsome to Corey and go beyond the "mere insults and indignities" of *Dicomes*. *Id.* at 630.

¶23 Public figures and officials must prove falsity and actual malice in order to prevail on an outrage claim. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988). As discussed above, Corey presented evidence to support both falsity and actual malice. Therefore, Corey also meets the high bar established for a public figure's outrage claim.

¶24 The trial court did not err in denying the judgment as a matter of law on the outrage claim.

## II. Negligence Cause of Action

¶25 The trial court allowed Corey to present a novel claim to the jury—negligent dissemination of harmful information. The instruction to the jury read, "Defendant had

a duty to exercise reasonable care in the performance of its duties as the [PCPA]. This duty includes the duty to refrain from disseminating confidential information to the public that is not a matter of public concern and is harmful to the Plaintiff." When deciding whether to allow Corey to go to the jury on this new tort theory, the trial court had to determine "whether a public figure such as Ms. Corey has a cause of action for negligent dissemination of harmful information. Namely, the existence of a criminal investigation that has not been substantiated, at least according to her version of the events."

¶26 In its ruling, the trial court gave a thorough, reasoned explanation for allowing this new tort. The court had to balance competing interests—the First Amendment and the right to privacy. It said,

> So on the one hand, we've got these cases involving the First Amendment and public officials which hold that you can't allege negligence. On the other hand, plaintiffs have cited this recent Bellevue School District case where the Washington Supreme Court held that teachers who are the subject of unsubstantiated allegations of sexual misconduct have a right to privacy in their identities, and that such information is not a matter of public concern.

(Citing *Bellevue John Does 1-11 v. Bellevue Sch. Dist. No. 405*, 164 Wn.2d 199, 189 P.3d 139 (2008).) The trial court concluded that "the First Amendment is not a bar to the adoption of a negligence standard based on the facts of this case" and emphasized that the fact that the allegations were *unsubstantiated* is of critical importance to the analysis. In the end, the trial court announced that "a sound basis exists for imposing a duty of care in Washington regarding the disclosure of possibly truthful but harmful information."

¶27 We disagree. Case law does not support a tort cause of action for damages due to negligent disclosure of unsubstantiated information. Instead, the concern for privacy noted by the trial court stems from the Public Records Act (PRA). Ch. 42.56 RCW. Under the PRA, an invasion of

privacy occurs "if disclosure of information about the person: (1) Would be highly offensive to a reasonable person, and (2) is not of legitimate concern to the public." RCW 42.56.050. In *Dawson v. Daly*, a prosecutor sought an injunction to prevent the release of a deputy prosecutor's personnel file. 120 Wn.2d 782, 788, 845 P.2d 995 (1993). The court determined that the disclosure of the prosecutor's performance evaluations that did not discuss specific instances of misconduct was highly offensive and lacking in legitimate public interest. *Id.* at 800. The right to privacy was protected through injunction. Nowhere is there a discussion of a tort action for damages in the event of a violation of the right of privacy. Furthermore, the court did not address the proper standard to be applied if the personnel file did include allegations of misconduct.

¶28 The Supreme Court has determined that instances of misconduct in the course of the job performance of a public official or employee subject to the PRA are not matters of personal privacy. *Cowles Publ'g Co. v. State Patrol*, 109 Wn.2d 712, 726, 748 P.2d 597 (1988). Under the PRA, "a law enforcement officer's actions while performing his public duties or improper off duty actions in public which bear upon his ability to perform his public office do not fall within the activities to be protected." *Id.* at 727. Similarly, release of a report confirming many allegations of a judge's inappropriate behavior did not invade the judge's privacy, because the allegations were substantiated and of substantial interest to the public. *Morgan v. City of Federal Way*, 166 Wn.2d 747, 756-57, 213 P.3d 596 (2009).

¶29 But, where allegations of misconduct are unsubstantiated, release of records would constitute an invasion of privacy. *Bellevue John Does*, 164 Wn.2d 199. In *Bellevue John Does*, the court held that the identities of public school teachers who are subjects of unsubstantiated allegations of sexual misconduct are exempt from disclosure under the PRA. *Id.* at 205. The identity of an accused teacher may be disclosed only if the misconduct is substantiated or results in discipline. *Id.* at 206. The court determined that,

in the context of the PRA, the identities of teachers subject to unsubstantiated allegations of sexual misconduct were not matters of legitimate public concern. *Id.* at 221. "When an allegation is unsubstantiated, the teacher's identity is not a matter of legitimate public concern. In essence, disclosure of the identities of teachers who are the subject of unsubstantiated allegations 'serve[s] no interest other than gossip and sensation.' " *Id.* (alteration in original) (quoting *Bellevue John Does 1-11 v. Bellevue Sch. Dist. No. 405*, 129 Wn. App. 832, 854, 120 P.3d 616 (2005), *rev'd in part*, 164 Wn.2d 199.

¶30 Based on this case law, substantiated instances of misconduct on the job, or in public and bearing on performance of a public duty, are within the legitimate public interest and subject to disclosure under the PRA. Unsubstantiated allegations of misconduct and private activities are exempt from disclosure. But, this protection stems solely from the PRA through injunctive relief. Nothing in the case law establishes a tort cause of action. Thus, while Washington has expressed an interest in protecting privacy, the Supreme Court has not yet recognized a cause of action for negligent disclosure of such unsubstantiated allegations. The trial court erred in recognizing and instructing the jury on this cause of action.

¶31 Notwithstanding the elimination of the negligence cause of action, the verdict remains unaffected. Corey presented evidence and argued the same damages for the intentional and negligence torts. The intentional and negligent causes of action were based on the same actions and harm to Corey's reputation. The evidence of actual malice necessary to prove outrage, defamation, and false light and the resulting damage is arguably more extensive than that required to prove a mere negligence claim. Because the evidence presented for damages from the intentional torts is coextensive—or broader—than necessary to prove damages from negligence, the full verdict stands.

III. <u>Prosecutorial Ethics—Expert Testimony</u>

¶32 As part of her case, Corey elicited expert testimony from Professor Larry Echohawk. He testified about the role of the prosecutor and ethical standards, including standards relating to interactions with the press and confidentiality. The County claims that the admission of this testimony constituted improper testimony about an issue of law, because it established a duty of care for the prosecutor as to the negligent dissemination claim.

¶33 Because we have determined that Washington does not recognize a tort cause of action for negligent dissemination of confidential information, we need not determine if Echohawk's testimony on this subject was improper. His testimony about prosecutorial ethics and Horne's breach of the ethical standards pertaining to the confidentiality and the press is relevant to the issue of malice as required to prove the intentional torts. The testimony was admissible for this purpose and did not impermissibly taint the verdict.

IV. <u>Promissory Estoppel</u>

¶34 Although Corey brought a breach of contract claim, the trial court concluded that Corey did not have either an express or implied contract for just cause termination, because there was no consideration. But, the trial court allowed her to go to the jury on a theory of promissory estoppel. Promissory estoppel requires "(1) [a] promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise." *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967). In the employment context, "where the terminable-at-will doctrine is concerned, the promise for promissory estoppel must be a 'clear and definite promise'." *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 173, 876 P.2d 435 (1994) (quoting 1 PAUL H. TOBIAS, LITIGATING WRONGFUL DISCHARGE

CLAIMS § 4.52, at 4-89 (1993)). The County argues that Corey did not establish that she had received a "clear and definite promise" to convert her from an at will to a just cause employee. *Id.*

¶35 Corey's testimony provided the basis for the alleged promise. Before taking a management position with Horne's administration, Corey had been a member of the guild for deputy prosecutors and enjoyed all the benefits the union had won, including just cause termination. According to Corey, she was interested in taking the job as chief of the felony division and assistant chief criminal deputy, but the job security represented by just cause termination was very important. She testified that as a result of her concerns about job security she had multiple conversations with Horne about the terms of her employment. "[H]e repeatedly, unequivocally told me that in his administration, I would have just cause termination. I would have that benefit." Corey said she asked about just cause termination, "[n]ot once, not twice, but numerous times." In response, she was unequivocally and repeatedly told, "Barbara, in my administration, you will have just cause termination." Corey testified that she would not have taken the position without unequivocal assurance that she would have just cause termination.

¶36 The County contends that this testimony does not adequately establish a clear and definite promise as a matter of law, citing *Rolph v. McGowan*, 20 Wn. App. 251, 255-56, 579 P.2d 1011 (1978). *Rolph* discusses reformation of a contract based on a mutual mistake. *Id.* at 255. For reformation, evidence of a mistake of fact must be clear, cogent, and convincing. *Id.* The court concluded that the clear, cogent, and convincing standard "is not met where the only evidence consists of uncorroborated conflicting testimony by the parties." *Id.* at 256. Based on this, the County argues that uncorroborated testimony does not establish a clear and definite promise of just cause status.

¶37 But, *Rolph* is inapposite, because it concerns the evidence needed to reform a contract rather than

the evidence required to establish promissory estoppel. *Id.* at 255. Promissory estoppel for just cause termination requires evidence of a clear and definite promise; the cases do not mention the clear, cogent, and convincing evidence standard. *See Havens,* 124 Wn.2d at 173. *Rolph* says only that conflicting, uncorroborated testimony does not satisfy the clear, cogent, and convincing standard. 20 Wn. App. at 256. The case does not stand for the proposition that uncorroborated testimony cannot satisfy the requirements of promissory estoppel. Corey's testimony, if believed by the jury, provides the required clear and definite promise of just cause termination.

¶38 The County also contends that Horne did not have the authority to promise just cause termination. According to the County, Corey could not have justifiably relied on the promise of just cause termination because RCW 36.27.040, RCW 41.56.030(2), and the Pierce County Charter allow only for at will employment for deputy prosecutors.

¶39 RCW 41.56.030(2) defines "public employee" for the purposes of collective bargaining, and specifically exempts a person "whose duties as deputy, administrative assistant or secretary necessarily imply a confidential relationship to (i) the executive head or body of the applicable bargaining unit, or (ii) any person elected by popular vote, or (iii) any person appointed to office pursuant to statute." RCW 41.56.030(2)(c). As a deputy to an elected official, Corey was statutorily exempt from the bargaining unit.

¶40 Under RCW 36.27.040, the prosecuting attorney may appoint deputies and "may revoke appointments at will." And, "the provisions of RCW 41.56.030(2) shall not be interpreted to permit a prosecuting attorney to alter the at-will relationship established between the prosecuting attorney and his or her appointed deputies by this section for a period of time exceeding his or her term of office. Neither shall the provisions of RCW 41.56.030(2) require a prosecuting attorney to alter the at-will relationship established by this section." RCW 36.27.040.

¶41 RCW 36.27.040 appears to establish at will employment as the default for appointed deputy prosecutors. The statute says that the prosecuting attorney cannot alter the at will relationship "for a period of time exceeding his or her term of office." *Id.* This implies that the at will relationship can be altered *during* the term of office. Furthermore, the prosecuting attorney is not required to alter the at will relationship established by this section. RCW 36.27.040. Read in its entirety, nothing in the statute precludes a change in a deputy prosecutor's employment status from at will for the duration of the prosecuting attorney's term. Rather, the statute implies that the employment status of deputy prosecuting attorney is at the discretion of the prosecuting attorney.

¶42 The Pierce County Charter (PCC) exempts employees of the prosecuting attorney from the merit based personnel system, except as modified by ordinance. PCC § 7.20(1)(d). The County claims that Corey knew of the limitations and could not have reasonably relied on his promise to the contrary.

¶43 The PCC reads that the council must maintain a merit based personnel system applicable to County employees, except "those employees of the Prosecuting Attorney and Superior and District courts according to State Law; provided the above independent elected officials may request and the Council and Executive may grant, by ordinance, modifications to this exemption." PCC §§ 7.10, 7.20(1)(d). Under the PCC, Corey was exempt from the merit system. And, the record does not demonstrate that Corey requested return to the merit system. She merely sought to retain her just cause termination benefit. Nothing in the record suggests that the entitlement to just cause termination is coextensive with all the benefits inherent in the merit based personnel system of the County. Nothing in the PCC prevents Horne from granting Corey just cause termination without inclusion in the merit based system.

¶44 Neither RCW 36.27.040 nor the PCC precludes alteration of the at will employment status of an assistant

chief deputy prosecutor during the term of the prosecuting attorney. Corey was entitled to proceed under the theory of promissory estoppel.

## V. Exclusion of "Disparaging" Evidence

¶45 The County claims that the trial court erred by granting Corey's motion excluding evidence that might "disparage" her. This includes any evidence that Corey had been subject to prior internal investigations and about her then-husband's prosecution for embezzlement and her subsequent bankruptcy and divorce. The County contends that the evidence is relevant to the reasonableness of the investigation into the missing money and the claimed damage to her reputation.

¶46 We review decisions on evidentiary issues for abuse of discretion. *Cox v. Spangler*, 141 Wn.2d 431, 439, 5 P.3d 1265, 22 P.3d 791 (2000). Relevant evidence is admissible. ER 402. But, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." ER 403. Here, the "disparaging" evidence stemmed from Corey's personal life. The trial court concluded that the prejudicial impact outweighed the probative value of the evidence of Corey's former husband's embezzlement and her bankruptcy. The court specified that general reference to domestic turmoil or a bad marriage was allowed, but not the details of embezzlement and bankruptcy. In addition, the court allowed for the possibility of reconsideration of the ruling if expert testimony deemed the embezzlement crucial to Corey's emotional status, thereby increasing its probative value. The trial court did not abuse its discretion in its determination that the evidence was more prejudicial than probative.

¶47 Furthermore, although a defamation defendant may attempt to mitigate damages, the proffered evidence must demonstrate a bad reputation in the community. *Roper v. Mabry*, 15 Wn. App. 819, 823, 551 P.2d 1381 (1976). Here, the evidence did not concern Corey's reputation in the

community, but facts about her past personal life. This is not admissible for mitigating damages in a defamation suit.

¶48 Given the type of evidence involved and the proper balancing analysis made on the record, the trial court did not abuse its discretion by excluding evidence that might "disparage" Corey.

## VI. Attorney Fees

¶49 The trial court struck Corey's request for attorney fees under RCW 49.48.030 as untimely under CR 54(d)(2). Application of a court rule to a particular set of facts is a question of law reviewed de novo. *Mee Soon Kim v. Pham*, 95 Wn. App. 439, 441, 975 P.2d 544 (1999). Under RCW 49.48.030, attorney fees are assessed against the employer in any action resulting in successful recovery of a judgment for wages or salary owed. Because Corey received an award of damages for her promissory estoppel claim, she is entitled to her attorney fees. But, the trial court determined that Corey submitted her request for fees after the time limitation established by CR 54(d)(2).

¶50 CR 54(d)(2) establishes that "[u]nless otherwise provided by statute or order of the court, the motion must be filed no later than 10 days after entry of judgment." Corey does not dispute that she filed her request for fees more than 10 days after entry of judgment. However, she contends that RCW 49.48.030 provides a separate time period for fee claims and, therefore, her request was not untimely.

¶51 RCW 49.48.030 is a remedial statute and must be construed liberally in favor of the employee. *Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett*, 146 Wn.2d 29, 34, 42 P.3d 1265 (2002). In *Fire Fighters*, fees were awarded based on a complaint filed in court after a successful grievance in arbitration. *Id.* at 33. The court held that "RCW 49.48.030 does not require that for attorney fees to be awarded in *any* action, that action must be the 'same action' in which wages or salary owed are recovered." *Id.* at 44. Corey argues that if fees under RCW 49.48.030 can be

recovered in a separate action, the 10 day requirement of CR 54(d)(2) must not apply to such fee requests.

¶52 *Fire Fighters* was decided before the Supreme Court adopted the 2007 amendment to CR 54(d), which included the time limitation. However, the outcome of *Fire Fighters* would not have been different had the rule been in place. The request for attorney fees in *Fire Fighters* was the claim for relief when the action was filed. CR 54(d) would not have come into play.

¶53 Unlike *Fire Fighters*, Corey was already in court on the underlying claims. A separate action for fees was not necessary. We do not believe the mandate of liberal construction of the statutory attorney fees claim precludes the application of a temporal limitation, such as that in CR 54(d). The timeliness requirement of CR 54(d) applies only after the underlying claim is reduced to judgment in court. Corey has not shown excusable neglect or reason for delay in making her request for fees. The trial court properly denied the fees as untimely under CR 54(d).

¶54 We affirm the trial court's decision on the fees, the intentional torts, the promissory estoppel claim, and evidentiary issues. We decline to recognize the claim for negligent disclosure of unsubstantiated information and strike that cause of action. But, the verdict remains unaffected. And, while Corey's trial court attorney fees were properly struck, under RCW 49.48.030 she is entitled to fees on appeal for her successful recovery of wages owed.

¶55 We affirm.

DWYER, A.C.J., and COX, J., concur.

Reconsideration denied March 26, 2010.

Review denied at 170 Wn.2d 1016 (2010).