# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

KATHIE COSTANICH,

               Appellant,

       v.

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES (DSHS); SANDRA
DURON and JOHN DOE DURON; CAROL
SCHMIDT and JOHN DOE SCHMIDT;
BEVERLY PAYNE, and JOHN DOE
PAYNE; JAMES BULZOMI and JANE
DOE BULZOMI; ROBERT STUTZ and
JANE DOE STUTZ; INGRID McKENNY
and JOHN DOE McKENNY,

               Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 68744-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: November 4, 2013

APPELWICK, J. — In 2001, the Department of Social and Health Services investigated allegations that Costanich physically and emotionally abused foster children in her care. DSHS made a formal emotional abuse finding, because Costanich swore around the children. Her foster care license was eventually revoked. Costanich sued DSHS on several theories. The trial court eventually dismissed Costanich's negligent investigation and outrage claims on summary judgment. We affirm.

## FACTS

Kathie Costanich has been a licensed foster parent in Washington since 1983. Costanich v. Dep't of Soc. & Health Servs., 627 F.3d 1101, 1103 (2010); Costanich v. Dep't of Soc. & Health Servs., 138 Wn. App. 547, 552, 156 P.3d 232 (2007), reversed in part by, 164 Wn.2d 925, 194 P.3d 988 (2008). She specializes in caring for sexually aggressive youth and medically fragile infants. Costanich, 138 Wn. App. at 552. In July

2001, Costanich had six children living in her home: three male foster children, K. (15), J. (12), and P. (10); one male under dependency guardianship, F. (17); and two sisters also under dependency guardianship, E. (8) and B. (4).[1] Costanich, 627 F.3d at 1103-04. All of her foster children were victims of abuse or neglect, and many had behavioral, developmental, and medical problems. Costanich, 138 Wn. App. at 552. At the time, the Department of Social and Health Services (DSHS) described the Costanich foster home as a "'unique and valuable resource . . . unsurpassed by any foster home in the State.'" Id. (alteration in original). Costanich was also president of the Foster Parents of Washington State and a trainer for DSHS. Id.

E. and B. lived with Costanich since infancy. They are both enrolled members of the Kalispel Tribe (Tribe). With the Tribe's permission, Costanich became their dependency guardian pursuant to court orders entered in 1996 and 1998. The orders required Costanich to provide E.'s and B.'s birth mother with visitation, consult the Tribe and the mother on cultural and religious issues, and maintain contact with the Tribe. The Tribe would not allow Costanich to adopt the girls.

Child Abuse Investigation

In summer 2001, Sandra Duron, a social worker for Child Protective Services (CPS),[2] began investigating K'.s statements to his therapist that Costanich physically and emotionally abused the children in her care. Costanich, 627 F.3d at 1104. K. claimed that Costanich put her hands around F.'s neck and said, "'I'll kill you bastard'" after seeing an altercation between F. and one of her aides. Id. F.'s account of the

---

[1] We refer to the children only by their first initials to protect their privacy.
[2] CPS is a branch of DSHS.

2

incident was basically the same. Id. K. also said Costanich told P. to move his "'black ass'" and clean his room. Id. And, K. claimed that Costanich called E. a "'cunt'" and saw her grab E.'s hair. Id. Duron reported that J. told her he saw Costanich rub urine-soaked sheets in P.'s face. Id. Costanich acknowledged that she openly swore around the children, but did so to take the "power" out of profanity.

In her report, Duron indicated that all the children claimed Costanich used profanity regularly, and all but one claimed she directed profanity at them and used physical violence. Id. All the adults Duron interviewed also admitted Costanich used profanity, but they differed on whether it was directed at the children and whether Costanich used physical violence. Id. A clinical psychologist who reviewed Duron's records but did not interview the children opined that swearing at children may lead to or exacerbate behavioral problems. Id. Duron concluded that the emotional abuse allegation was "'founded,'" but the physical abuse allegation was "'inconclusive.'" Id.

In November 2001, DSHS told Costanich that if she did not appeal its emotional abuse finding and agreed to participate in a corrective management plan, it would not seek termination of her guardianship of E. and B. Id. at 1105. By that time, DSHS had removed P. and J. from the Costanich home. In December 2001, DSHS made a formal finding of emotional abuse. Id. On March 14, 2002, DSHS informed Costanich that it upheld the finding of emotional abuse after internal review. Id. Costanich requested an administrative hearing on March 24, 2002. Id.

Meanwhile, DSHS urged the Kalispel Tribe to take jurisdiction and remove E. and B. from Costanich's care. The Tribe initially refused. On March 28, 2002, four days after Costanich requested the administrative hearing, DSHS filed a motion to terminate

3

her guardianship of E. and B. The petition was supported by Duron's declaration that Costanich "'uses profanity, name-calling, and derogatory racial terms as means to discipline and intimidate the children.'" Id.

On April 12, 2002, the day the contested termination hearing was scheduled, Costanich and the Tribe entered an agreed motion and order transferring jurisdiction to tribal court. The guardianship termination motion was never heard by the juvenile court. Per the Tribe's request, however, DSHS continued to exercise "courtesy supervision" of the girls, conducting home visits and reporting to the Tribe. Costanich subsequently entered a visitation order with the Tribe, agreeing that E. and B. would live with the Tribe for 30 days in the summer of 2002. The Tribe returned E. and B. to Costanich after the 30 days.

Administrative Appeal of Emotional Abuse Finding and License Revocation

On August 16, 2002, DSHS revoked Costanich's foster care license. Costanich, 138 Wn. App. at 553. Costanich appealed both the finding of abuse and the revocation of her license. Id. In late 2002 and early 2003, an administrative law judge (ALJ) held 19 days of evidentiary hearings and heard testimony from 49 witnesses. Costanich, 627 F.3d at 1106. The ALJ overturned the DSHS decision, finding that the children were not emotionally abused, but in fact were thriving based on their therapists' and social workers' testimony. Costanich, 138 Wn. App. at 553. The ALJ found that K.'s hearsay statements lacked credibility and Costanich's swearing was never directed at the children. Id. at 556-57, 558-59.

DSHS appealed and the DSHS Board of Appeals review judge reversed the ALJ's decision. Id. at 553. He found there was substantial evidence that Costanich

4

threatened to kill F., told P. to move his "'black ass,'" called E. names, and swore at the children. Id. He concluded that this constituted emotional abuse and justified revoking Costanich's license. Id. Costanich appealed and the superior court reversed the review judge's final administrative decision. Id. The superior court awarded Costanich attorney fees under the equal access to justice act, RCW 4.84.350. Id.

DSHS appealed from the superior court's reversal. Id. The primary issue on appeal was the level of deference the review judge owed the ALJ. Id. at 554. We held that the review judge acted outside the scope of his authority in making additional, contradictory findings based solely on hearsay evidence. Id. at 559. We set aside the review judge's decision, reinstated the ALJ's decision, affirmed the superior court's decision to award Costanich attorney fees, and awarded Costanich attorney fees on appeal.[3] Id. at 564. We concluded that "although DSHS was justified initially in its concerns about Costanich's use of profanity, the evidence before the ALJ shows that DSHS was not substantially justified in revoking her license once it became aware of the problems with Duron's investigation." Id.

Federal Appeal of § 1983 Claims

While Costanich's administrative appeal was pending in superior court, she filed another action in state court against DSHS and six DSHS agents, asserting 42 U.S.C. § 1983 claims, as well as negligent infliction of emotional distress, outrage, negligent

---

[3] DSHS filed a motion to modify the Commissioner's award of $46,239 in attorney fees. Costanich, 164 Wn.2d 928. We granted the motion and denied Costanich attorney fees but sanctioned DSHS for not raising its arguments earlier. Id. Costanich then filed a petition for review. Id. The Washington Supreme Court held that the equal access to justice act provides a statutory cap of $25,000 for each level of judicial review. Id. at 934-35.

investigation, malicious prosecution, and abuse of process. Costanich, 627 F.3d at 1106 & n.9. DSHS removed the action to federal court, where it was held pending the state court appeal. Id. at 1106. The individual defendants then moved for summary judgment, asserting absolute and qualified immunity. Id. at 1106-07. Costanich also moved for partial summary judgment on her § 1983 claims, arguing that Duron's fabrication of evidence deprived her of her right to due process. Id. at 1107. The district court granted the defendants' cross motion for summary judgment on all federal claims and declined to exercise supplemental jurisdiction over the state tort claims. Id. Both Costanich and DSHS cross appealed to the Ninth Circuit. Id.

The Ninth Circuit held that deliberately fabricating evidence in civil child abuse proceedings violates due process when a liberty or property interest is at stake. Id. at 1108. The court held that genuine issues of material fact existed as to whether Duron deliberately fabricated evidence during her investigation, which led to termination proceedings and license revocation.[4] Id. The Ninth Circuit recognized that Costanich produced evidence of Duron misquoting and misrepresenting witness statements. Id. at 1111. For instance, Duron's report indicated she interviewed 34 people. Id. at 1112. She later admitted that she had only brief contact with 18 of the identified witnesses. Id. The Ninth Circuit explained that Duron's "misrepresentations about interviewing the children's doctors were especially significant." Id. Duron stated that she interviewed

---

[4] To sustain a deliberate fabrication of evidence claim, the plaintiff must, at a minimum, point to evidence that supports at least one of two propositions: (1) defendants continued their investigation despite the fact that they knew or should have known that the plaintiff was innocent, or (2) defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. Costanich, 627 F.3d at 1111.

three therapists and received reports from a fourth, which lent credibility to her report. Id. But, she testified before the ALJ that she did not actually speak to any medical professionals. Id. Duron also admitted that she never interviewed K.'s therapist, despite suggesting in her report that she had a conversation with him. Id. She further conceded that in her meeting with K., "'K. wouldn't say much,'" so she "just kind of summarized what he was saying.'" Id.

Other witnesses also pointed out that Duron's report contained evidence and statements they never made. Id. For example, according to Duron's report of her interview with Diane Isley, F.'s guardian ad litem, Isley stated that Costanich, in reference to a child that might try to run away, said she would "'chain the little shit to the bed.'" Id. Isley declared in a sworn letter, however, that she never made this statement and never talked to Duron about such a child. Id. Duron also reported that another aide, Crystal Hill, said that Costanich was "'always calling E. a fucking cunt, and bitch.'" Id. (internal quotation marks omitted). But, in a sworn letter, Hill stated, "'I have never seen her directly swear face to face at one of the children.'" Id. The Ninth circuit concluded that Duron's purposeful use of quotation marks around many of the purported witness statements—including Isley's and Hill's statements—could support a trier of fact's conclusion that she deliberately fabricated evidence. Id.

Also contrary to Duron's report, witnesses' sworn letters expressed positive descriptions of the Costanich foster home. Id. In fall 2001 and spring 2002, J.'s, K.'s, E.'s, and B.'s therapists wrote to DSHS reporting that the children were doing well in Costanich's home and strongly recommended against their removal. Id. at 1104. Specifically, J's therapists noted his substantial improvements in Costanich's home and

7

expressed their belief that DSHS "'did not, in a reasonable manner, consult with [J.'s] providers on how his removal from the foster home was to be conducted.'" Id. at 1105. E.'s and B.'s therapist also prepared a sworn letter describing the loving, nurturing relationship between Costanich and the girls, and warned DSHS of the "'emotional damage that removing them will cause.'" Id. Likewise, K.'s therapist wrote of the stability in Costanich's home and the progress K. made there, and emphasized that moving K. "'would be detrimental to K.'s emotional and mental health.'" Id.

The Ninth Circuit concluded that Duron's errors were not a question of tone or characterization, but rather actual misrepresentations. Id. at 1113. The court acknowledged that Duron could have believed Costanich was guilty of emotional abuse. Id. However, that belief did not permit or excuse deliberate falsification of evidence. Id. Nevertheless, the Ninth Circuit held that Duron was entitled to qualified immunity, because the right to due process in proceedings adjudicating a foster care license and terminating guardianship was not clearly established at the time of the investigation. Id. at 1108.

### State Court Negligent Investigation and Outrage Claims

Following the two appeals, Costanich pursed her remaining tort claims in state court, including negligent investigation and outrage. Costanich's negligent investigation claim related only to events surrounding E.'s and B.'s guardianship. Costanich and DSHS made cross motions for summary judgment. The trial court denied Costanich's motion for partial summary judgment. The court granted DSHS's motion in part, dismissing Costanich's outrage claim. However, the court refused to dismiss Costanich's negligent investigation claim, finding genuine issues of material fact as to

8

whether Costanich was a de facto parent or guardian with standing to sue under RCW 26.44.010.

The trial court subsequently requested additional briefing from the parties regarding the application of Roberson v. Perez, 156 Wn.2d 33, 123 P.3d 844 (2005), to Costanich's negligent investigation claim. The court presumed for the purposes of summary judgment that DSHS made a biased or faulty investigation. However, the court concluded that DSHS made no harmful placement decision as a matter of law, because Costanich voluntarily removed E. and B. from the jurisdiction of the dependency court. The trial court therefore held that Roberson controlled and dismissed Costanich's negligent investigation claim. Costanich appeals.

## DISCUSSION

Costanich argues that the trial court erred in dismissing her negligent investigation claim when it found that DSHS did not make a harmful placement decision. She also argues that the trial court erred in dismissing her outrage claim, because the Ninth Circuit already held that genuine issues of material fact exist as to whether Duron deliberately fabricated evidence. Lastly, she asks that we vacate the trial court's award of costs to DSHS.

We review an order granting summary judgment de novo. Hadley v. Maxwell, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). We review all facts and reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. CTVC of Haw. Co. v. Shinawatra, 82 Wn. App. 699, 708, 919 P.2d 1243, 932 P.2d 664 (1996). Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Peterson

v. Groves, 111 Wn. App. 306, 310, 44 P.3d 894 (2002). Unsupported, conclusory allegations or argumentative assertions are not sufficient to defeat summary judgment. Vacova Co. v. Farrell, 62 Wn. App. 386, 395, 814 P.2d 255 (1991). Instead, the plaintiff must put forth evidence showing a triable issue exists. Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 12-13, 721 P.2d 1 (1986).

I.    Negligent Investigation Claim

Costanich argues that the trial court erroneously dismissed her negligent investigation claim on summary judgment. She points out that the trial court agreed there were fact questions as to whether DSHS's investigation was biased or faulty. However, the court ruled that DSHS did not make a harmful placement decision as a matter of law under Roberson. Costanich contends this was error, because there are genuine issues of material fact as to whether she voluntarily sent E. and B. to live with the Tribe. She argues that DSHS's "negligent and outrageous conduct plainly coerced [her] to give up her daughters temporarily, fearing that she would otherwise lose them forever."

Washington courts recognize an implied cause of action against DSHS for negligent investigation of child abuse allegations under chapter 26.44 RCW. Roberson, 156 Wn.2d at 44-45. However, negligent investigation claims are cognizable only when DSHS conducts a biased or faulty investigation that leads to a harmful placement decision, such as placing a child in an abusive home, removing the child from a nonabusive home, or failing to remove the child from an abusive home. Id. at 45.

In Roberson, the city of Wenatchee and Douglas County investigated child abuse allegations in the publicized "Wenatchee sex ring." Id. at 36. Honnah Sims learned that

police reports identified her as among those accused of abusing children. Id. Fearing imminent arrest, she sent her 13 year old son to live with a grandparent in Kansas, relinquishing guardianship to that grandparent. Id. Sims was eventually acquitted of all charges, and her son returned to the family after living with his grandparent for seven months. Id. Sims later sued DSHS for negligent investigation, arguing that sending her son away was a preemptive move tantamount to constructive removal. Id. at 37, 46.

The Washington Supreme Court rejected this argument and held there was no harmful placement as a matter of law, because Sims sent her son away through voluntary acts. Id. at 46-47. The court recognized three reasons why extending the cause of action for negligent investigation to include such "constructive placement" would be problematic and beyond the statute. Id. at 46. First, any harm resulting from the investigation would be purely speculative in nature. Id. It would be difficult to determine what placement action, if any, that DSHS might have taken. Id. Second, claimants asserting constructive placement could largely control the extent of their damages. Id. Because damages reflect disruption to the family unit, the length of such a disruption is proportionate to the damage. Id. Sims, for example, determined the length of time that her son was away from home. Id. Third, extending harmful placement to include constructive placement could encourage individuals to frustrate investigations. Id. at 47. Thus, constructive placement is insufficient to meet the legal standard for a harmful placement decision. Id.

Costanich argues that her case is comparable to Tyner v. Dep't of Soc. & Health Servs., 141 Wn.2d 68, 1 P.3d 1148 (2000), rather than Roberson. In Tyner, a DSHS caseworker filed a dependency petition alleging that Tyner sexually abused his children.

Id. at 73-74. As a result, the court prohibited all contact and separated Tyner from his children for several months. Id. at 73, 75. The caseworker subsequently completed an investigation and concluded that the abuse allegations were unfounded. Id. at 74. However, he failed to inform the court of his finding and the court continued to restrict Tyner's contact with his children. Id. at 74-75. The Supreme Court held that the judge's no-contact order will act as a superseding cause, "precluding liability of the State for negligent investigation, only if all material information has been presented to the court and reasonable minds could not differ as to this question." Id. at 88. Costanich argues that like in Tyner, DSHS failed to provide the Tribe with all relevant information, such as statements from E.'s and B.'s therapists that they would suffer emotional harm if they were removed from Costanich's care.

However, Tyner is distinguishable. In that case, the children were actually removed from Tyner's care, because DSHS neglected to turn over relevant information to the court. Id. at 73-74. In contrast, DSHS made no placement decision here. Costanich voluntarily transferred jurisdiction to the Tribe. Once the Tribe had jurisdiction, DSHS had no input or control over any subsequent placement decision. Costanich nevertheless attempts to distinguish Roberson, because here DSHS filed a motion to terminate her guardianship of E. and B. However, in Roberson, on the day of Sims's arrest, CPS filed a dependency petition for her son and obtained a court order to take him into shelter care.[5] 156 Wn.2d at 51 (Sanders, J., dissenting). We can infer, then, that an unexecuted placement decision does not constitute harmful placement

_____

[5] The dissent argued that this "unexecuted" placement decision "was a placement decision nonetheless," with "harmful consequences." Roberson, 156 Wn.2d at 52.

12

when the guardian preempts the State's removal of the child. By signing the agreed order with the Tribe, Costanich controlled the extent of her damages by determining the length of time that E. and B. were away from her home. DSHS did not make that decision. Costanich did. Like Roberson, we cannot say for sure that the juvenile court would have terminated Costanich's guardianship.

The record also shows that Costanich never actually transferred guardianship of E. and B. to the Tribe. Rather, she signed a visitation order agreeing that E. and B. would live on the reservation with tribal elders for 30 days. This was consistent with the terms Costanich agreed to in becoming E.'s and B.'s guardian. The order specified that the visit was "intended to be a summer vacation for the children," so they could participate in tribal events and visit extended family. The order also noted that Costanich and her husband "will visit the children" on the reservation during their summer vacation. The Tribe acknowledged that the "children have a parent/child relationship" with Costanich. And, a handwritten note on the order stated that the Costaniches "fully support the girls' close and continuing relationship with their Tribe [and] are pleased that the girls have this opportunity to know their relatives [and] other members [and] to learn more about their culture [and] customs." At the end of the 30 day summer vacation, the Tribe returned E. and B. to Costanich. E. lived with Costanich until June 2010 and B. still lives with her.

Costanich nevertheless contends that she did not voluntarily enter the agreed orders transferring jurisdiction and granting visitation, because DSHS's conduct was so egregious that she felt forced to relinquish guardianship of E. and B. to the Tribe. Even if true, this is the type of constructive placement argument the Supreme Court expressly

rejected in Roberson.[6]  In Roberson, Sims felt forced to send her son away, fearing the State would take him from her.  156 Wn2d at 36, 46.  Here, Costanich alleges that she felt forced to transfer jurisdiction and agree to summer visitation with the Tribe, because DSHS would otherwise take E. and B. away from her.  We hold that Roberson controls and Costanich's agreement to transfer jurisdiction to the Tribe and allow summer visitation was at most constructive placement.  This preempted any harmful placement decision by DSHS, so Costanich's negligent investigation claim fails as a matter of law.[7]

II.   Outrage Claim

Costanich argues that the trial court erred in dismissing her outrage claim on summary judgment.  She contends that the Ninth Circuit already held that Duron made material misrepresentations in her report, which is sufficient to support her outrage claim.  Even if Duron's misrepresentations are not sufficiently outrageous, Costanich argues, the Ninth Circuit also held that there are genuine issues of material fact as to whether Duron deliberately fabricated evidence.  She contends that it is "outrageous and utterly intolerable for a government employee to lie under oath and to fabricate

---

[6] Constructive placement is comparable to constructive discharge in the employment context.  DAVID K. DEWOLF & KELLER W. ALLEN, 16 WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 1.27, at 50 (3d ed. 2006).  Constructive discharge occurs when an employer engages in a deliberate act or pattern of conduct that makes working conditions so intolerable that a reasonable person would feel compelled to resign.  Washington v. Boeing Co., 105 Wn. App. 1, 15, 19 P.3d 1041 (2000).  In essence, constructive discharge occurs when an employee feels forced to resign because of intolerable conditions, as opposed to voluntarily resigning.  Id. at 15-16.  This comparison makes it clear that Costanich is asserting constructive placement.

[7] The State argues that we can affirm on the alternative ground that Costanich lacked standing to bring a negligent investigation claim.  Because there was no harmful placement decision, however, we need not reach the issue of standing.

grossly inflammatory evidence during a civil investigation," especially when the children's therapists said they were thriving in Costanich's home.

To establish the tort of outrage, or intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) severe emotional distress as a result. Reid v. Pierce County, 136 Wn.2d 195, 202, 961 P.2d 333 (1998). To prove extreme and outrageous conduct, it is not enough to show that the defendant acted with tortious or criminal intent, intended to inflict emotional distress, or even acted with malice. Grimsby v. Samson, 85 Wn.2d 52, 59, 530 P.2d 291 (1975). Rather, the conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (emphasis omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but the court must initially determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability. Dicomes v. State, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989).

The second two elements of outrage are satisfied here. The Ninth Circuit held that genuine issues of material fact exist as to whether Duron deliberately fabricated evidence during her investigation. Costanich, 627 F.3d at 1108. This satisfies the intentional or reckless infliction of distress prong for the purposes of surviving summary judgment. Likewise, Costanich alleged that she suffered from anxiety, depression, nausea, humiliation, and sleeplessness as a result of the investigation and abuse finding. Outrage does not require a showing of objective symptoms that constitute a

diagnosable disorder. Kloepfel v. Bokor, 149 Wn.2d 192, 197-98, 66 P.3d 630 (2003). Rather, emotional distress includes "'all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.'" Id. (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. j, at 77 (1965)). Costanich's alleged symptoms clearly meet this standard.

The question is then whether DSHS's conduct was sufficiently extreme and outrageous to become a question for the jury. Costanich relies on Corey v. Pierce County, 154 Wn. App. 752, 764, 225 P.3d 367 (2010), to argue that it was.[8] Barbara Corey worked as a prosecutor for 20 years. Id. at 757. After she resigned, Pierce County Prosecuting Attorney Gerry Horne publically accused her of criminal behavior despite knowing that an internal investigation revealed little substance. Id. at 764. Horne also implied that Corey mishandled public funds. Id. These comments devastated Corey, both emotionally and professionally. Id. at 759. As a prosecutor and public servant, such allegations were "particularly loathsome" to Corey and went beyond the mere insults and indignities. Id. at 764. Thus, Horne's behavior was sufficiently outrageous to warrant liability. Id.

In Corey, we distinguished Horne's outrageous actions from those in Dicomes. Id. In that case, Deanna Dicomes worked as an executive secretary for the Department of Licensing (DOL). 113 Wn.2d at 614-15. After she exposed budget data that created a public uproar, DOL initiated a "'management study'" as an allegedly pretextual way to

---

[8] In contrast, DSHS relies on Waller v. State, 64 Wn. App. 318, 824 P.2d 1225 (1992), to argue that the conduct here was not outrageous. Waller is distinguishable, though, because the DSHS caseworkers there were at most grossly negligent. Id. at 337. While negligence is insufficient to establish outrageous conduct, here we have a question of fact as to whether Duron's conduct was deliberate.

fire Dicomes. Id. at 616. The court found no atrocious, intolerable conduct where DOL terminated Dicomes by privately delivering a termination letter and briefly responding to media inquiries about the dismissal. Id. at 630. The fact of pretextual discharge was not sufficient to support her outrage claim. Id. At worst, Dicomes's allegations amounted to bad faith, but not outrage. Id. at 631. Likewise, in Lawson v. Boeing Co., several female employees complained that Charles Lawson sexually harassed them. 58 Wn. App. 261, 263, 792 P.2d 545 (1990). Lawson alleged that these employees "deliberately, maliciously and outrageously lied about him," which resulted in his demotion. Id. at 263, 270. We held that Lawson's contentions were not so outrageous in character and so extreme in degree as to warrant liability for outrage. Id. at 270.

Even if true, DSHS's conduct here was not so outrageous in character and so extreme in degree as to be regarded as atrocious and utterly intolerable in civilized society.[9] The record shows that Duron recorded and considered both favorable and unfavorable accounts of Costanich's behavior. Duron's finding of inconclusive physical abuse also indicates that she did not give complete credence to unsubstantiated allegations against Costanich. In contrast to Corey, where Horne falsely accused her of criminal behavior, all the children in the Costanich home reported that Costanich used

---

[9] Costanich argues that her expert, Darlene Flowers, testified that DSHS has a history of making adverse findings, revoking licenses, and taking other retaliatory measures against vocal foster parents like Costanich. On appeal, DSHS moved to strike Costanich's reference to "testimony" by expert Flowers. Flowers's curriculum vitae (CV) and proposed testimony is included in the record as an attachment to DSHS's motion in limine to exclude her testimony. In response to DSHS's motion in limine, Costanich claimed that DSHS mistakenly assumed the Flowers's CV was an expert report. It does not appear from the trial record before us that Flowers testified or was qualified as an expert. No expert opinion is properly before us, so we grant DSHS's motion to strike.

profanity regularly, and all but one claimed she directed profanity at them. At worst, DSHS's conduct was reprehensible and Duron conducted her investigation in bad faith. However, as <u>Dicomes</u> and <u>Lawson</u> hold, such conduct is not sufficiently extreme to result in liability. We hold that the trial court properly dismissed Costanich's outrage claim on summary judgment.

Because we affirm on all assignments of error, there is no basis for us to reverse the trial court's award of costs to DSHS.

We affirm.

Appelwick, J.

WE CONCUR:

Spearman, A.C.J.

Becker, J.