**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

DR. MOSES MA,

        Appellant,

        v.

JOHN GAGLIARDO and RICHARD COX,

        Respondents.

No. 83294-8-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Dr. Moses Ma sued John Gagliardo and Richard Cox based on actions allegedly taken against him as a volunteer swimming official. Ma appeals the trial court's decision granting summary judgment and dismissing his claims for violation of Washington's Law Against Discrimination (WLAD), ch. 49.60 RCW, defamation, tortious interference with contract, outrage, and civil conspiracy.[1] Because there are genuine issues of material fact, we reverse the trial court's decision dismissing Ma's

---

[1] Ma also contends the trial court erred in dismissing his claim for aiding and abetting under the Restatement (Second) of Torts, § 876 (Am. L. Inst.) (1977). Ma's brief fails to argue whether Washington has adopted § 876 as a standalone tort, fails to argue that he established the necessary elements, and fails to cite to the record in support. We will not consider an argument that is not adequately briefed or argued. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

claims under the WLAD and for tortious interference with contract.[2]  We otherwise affirm.

## I.

## A.

Ma participated as a volunteer swimming official with Pacific Northwest Swimming (PNS), a local swimming committee of USA Swimming (USAS).[3]  Gagliardo has been a member of PNS since 2008, a member of the PNS Officials Committee since 2011, and the elected Chair of the Officials Committee since May 2016.  Cox has been a member of the PNS Officials Committee since 2006.  The Officials Committee is responsible for recruiting, training, certifying, evaluating, recertifying, and supervising officials for PNS.  PNS is a voluntary organization, no one is paid.

There are five categories of officials within USAS: (1) stroke and turn, (2) starter, (3) chief judges, (4) referees, and (5) administrative officials.  Swim meets are categorized by level: N1 is the local level, N2 is the national level, and N3 is for international or Olympic competitions.  Officials are certified for each category to the level of meet the official can participate in.  Generally, the N1 certification process for each category requires two steps.  After a training class and test, the candidate must complete several novice sessions where they work at meets with a mentor in that category.  Then, after completion of the novice sessions, the candidate can be recommended for a final observation by an official authorized to issue certifications.

---

[2] Gagliardo cross appeals the cost award, arguing the trial court erred in granting only a pro rata share of the costs of deposition transcripts.  Because we reverse the order granting summary judgment Gagliardo's cross appeal is moot.

[3] Because we are reviewing the trial court's decision on summary judgment, we view the facts in the light most favorable to the nonmoving party—Ma.  Marquis v. City of Spokane, 130 Wn.2d 97, 105, 922 P.2d 43 (1996).

B.

In 2013, Ma began officiating to spend more time with his children, support their interest in swimming, and volunteer at their swim meets. Ma began the process of obtaining his N1 referee certification in 2015. During the time Ma was working toward certification as a referee, only four officials at PNS could perform final observations. Cox was one of the four. Generally, the N1 certification requires eight novice sessions before the candidate can be recommended for observation. Ma was required to perform 58 novice sessions over 17 months before obtaining certification.

Many officials that worked with Ma described him as "a fair, highly competent, and committed official," fair to swimmers, professional, and attentive to details. Ma's novice service logs contain positive comments about his officiating. These comments include: "Great job. Doing very well. Watches Deck. Misses Nothing."; "[Ma] is a natural."; "Takes directions well and implements changes right away." The logs also contain some suggestions for improvement, including "work on 'being the boss,'" and "work on timing." Ma acknowledged that he struggled with the starter position and did extra sessions, both at his own direction and based on feedback, to gain confidence in that role.

While Ma had many supporters, some officials had trouble with him, including Cox. After a meet that Cox described as "very frustrating," Cox wrote to several other officials at PNS "there is no way in hell [Ma] should ever be allowed to become a referee." In Cox's opinion, Ma "was a very difficult person to work with at meets." Cox believed that Ma was "not a bad official when his kids are not around" but could be very

distracted when they are present. Cox later observed Ma and certified him as an N2 starter, believing that Ma had improved in that position.

Ma was first observed for the his N1 referee certification after 16 novice sessions and with the recommendation of 3 meet referees. The final observation was conducted by Ron Van Pool in April 2016. Unknown to Ma, according to Gagliardo, he and Van Pool had agreed that the observation was for "educational" purposes because of Ma's "current weaknesses and how they must be resolved." According to Gagliardo, "[a]ctual observation as validating readiness observation for credentials will be at a mutually agreed upon meet by someone from the Officials Committee. Not yet, to my knowledge, defined."

During the observation, another PNS official tried to tell Ma how the meet should be run. Van Pool concluded that Ma should be observed again to show he could run a meet without allowing other officials to attempt to influence decisions. Van Pool told Ma that he only needed to complete one or two more novice sessions before being observed again. Ma completed several more novice sessions. Then, in May, Ma contacted PNS official Dave Coddington to be observed, but Coddington was unavailable.

In June, Ma contacted Van Pool and asked to be observed again. Van Pool forwarded the e-mail to Gagliardo, Cox, and a third PNS official, David Guffey, asking how they would like him to respond. Cox responded to Van Pool and said officials had told Ma he would not be observed the rest of the season which ended in July. Cox also stated that Ma "still doesn't get it," referring to Ma's ability to run a meet. Gagliardo agreed with Cox's statements.

In August 2016, Coddington e-mailed Cox to summarize a conversation he had with Ma, and Ma's path forward. The path forward included (1) Ma attending a fall referee clinic that Coddington had not scheduled, (2) passing the referee recertification and administrative referee recertification tests, (3) observation by Coddington or Van Pool only, "no substitutions," and (4) demonstrate "a knowledge of 'why' common practices exist, not just that they do, and he can do them." Cox responded to Coddington, "[d]on't know how to say this other than just saying it. There is no way [Ma] should ever become a referee."

Between Ma's observations, Cox and a few other officials raised some concerns about Ma's officiating. These concerns again included Ma's ability to focus on his assigned role rather than his parental role, his confidence, and missteps in protocols. But, Ma's novice official service logs continued to reflect positive comments and at least eight different meet referees recommended Ma for a second observation after his first, April 2016 observation.

Ma's second observation for deck referee was with Coddington in March 2017. Ma had completed another 42 novice sessions before the second observation. Before the observation, Cox shared some of the concerns other officials had about Ma with Coddington. During the meet Coddington observed Ma, Ma had a good day and Coddington granted Ma's certification as an N1 referee.

Upon learning that Ma had to complete over 50 novice sessions, other officials were "shocked" and "startled." One official described this as an "unprecedented number." Only one other official with PNS was required to complete a high number of novice sessions: Diane Vo completed 38 novice sessions. Like Ma, Diane Vo is of

Asian descent. While PNS officials expressed some concern about another official, Kevin Cooney, Cooney was certified on his first observation and after only 15 novice sessions. Kevin Cooney is white.

When Ma started working towards his N1 referee certification, only 29 percent of all PNS officials were of Asian descent and of the 61 referees with PNS, only 3 were of Asian descent.

C.

In March 2018, Ma asked for information from PNS to determine which swimmers would fall within the same category as his daughter for an upcoming meet. Ma believed he could request the information because, in years past, the information was routinely provided to parents and swimmers on the PNS website. Cory Keller, member of PNS and the chair of PNS SafeSport program[4] from 2016 to 2018, however, believed Ma's request was inappropriate because his purpose was to secure a competitive advantage for his child. Keller notified Ma that the request was inappropriate and informed the Chair of the Officials Committee, Gagliardo. Keller blind copied her contact at U.S. Center for SafeSport. After receiving Keller's notice, Ma did not press the issue.

In May 2018, Ma acted as chief judge during the two-day "May Flowers" meet. During a heat on Saturday, Diane Zhang, a stroke and turn judge, signaled a possible disqualification in one of the lanes she was observing. Ma met with Zhang to process the call and recommended that her call not be accepted. Ma contested Zhang's call

---

[4] According to its website, U.S. Center for SafeSport "is an independent nonprofit organization responsible for responding to and preventing emotional, physical, and sexual misconduct and abuse in the U.S. Olympic and Paralympic Movement." You Can Help End Abuse in Sport: About the Center, U.S. CTR. FOR SAFESPORT, https://uscenterforsafesport.org/endabuseinsport/ (last visited Jan. 18, 2023).

because he observed the swimmer's actions and believed Zhang's ruling was incorrect. While Ma was not initially aware that the call concerned his son, on site officials questioned Ma's objectivity. The officials were completely swamped that day, with hundreds of disqualifications to process, and Ma felt he could not recuse himself and delay things further. Ma was excused from acting as an official for the rest of the session and, that night, he was notified that he would not be officiating the rest of the meet.

On Sunday, Ma attended the May Flowers meet as a parent to watch his children. Zhang attended as stroke and turn judge and to watch her child. After the morning session, both Ma and Zhang left the aquatic center. The two spoke for a few minutes and had what Ma believed to be an "unnoteworthy" conversation. But after Zhang looked around for her daughter, Ma told Zhang where her daughter and ride were. This gave Zhang a "creepy" feeling, like her family was being watched. As a result, Zhang spoke to the meet referee, Thomas Matthes, described the conversation with Ma, and told Matthes she was afraid. Matthes escorted Zhang to her car.

Following the meet, Matthes contacted Keller. Because Keller believed the purpose of SafeSport is to protect coaches, athletes, parents, and officials from unsafe, or uncomfortable situations, she recommended that Matthes submit a SafeSport report to USAS. Matthes submitted a report, stating on the submission form that this was a bullying incident. Within a few days of the report to SafeSport, PNS officials were notified that the report was rejected. Cox responded, "there are other ways to take care of this issue."

PNS investigated the Saturday incident because it concerned the conduct of an official. Gagliardo solicited feedback from everyone involved and issued a report to the PNS Officials Committee. Gagliardo found the officials involved "showed biases in how the anecdotal reputation of [Ma] most certainly influenced the decisions made." Gagliardo also found the decision to remove Ma from deck for the rest of the session was appropriate and that "any further or future actions (i.e., not allowing him on the deck, revoking credentials, etc.) may not be properly justified at this time for this specific incident."

The Seattle Metropolitan Aquatic Club (SMAC), Ma's local swim club, separately investigated the Sunday incident between Ma and Zhang because it involved club members. After investigation, SMAC concluded that there was not enough evidence that Ma deliberately threatened Zhang. But because Zhang stated that she felt threatened, SMAC believed Ma violated their Parent Code of Conduct and gave Ma a set of conditions to follow in order to continue his membership with SMAC. Ma chose not to agree to the conditions and his family's membership with SMAC ended.

Following the May Flowers meet, Gagliardo began communicating with regional and national officials about the PNS Officials Committee's authority to suspend Ma's credentials and take disciplinary action. Gagliardo repeatedly communicated with SMAC for the results of their investigation. Officials with SMAC felt that PNS was having SMAC "do their dirty work for them" and that Gagliardo was under a lot of pressure to start the process of getting Ma kicked out. While SMAC believed that whatever findings they had "were internal to the club and didn't need to be shared," they eventually provided redacted information to PNS.

Doug Everett, Chair of USAS's Western Zone Board of Review e-mailed Gagliardo on June 20 and explained that the only official bodies that could suspend an official's credentials were the National Board of Review, a Zone Board of Review, or SafeSport. In his declaration, Gagliardo testified that two other USAS officials, Jim Holcomb (the National Officials Chair) and Dan McAllen (USAS Vice President of Program Operations), told him that because of the severity of the allegations, PNS could suspend Ma's credentials and then hold a hearing.

The PNS Officials Committee met on July 4 where Gagliardo reported his findings and discussions, and the committee voted to temporarily suspend Ma pending a hearing to discuss the committee's concerns. On July 7, 2018, PNS notified Ma of their decision. The notice stated that the committee had been notified of actions taken by Ma that were reported to the USAS Center for SafeSport, violations of a PNS team's code of conduct, violation of USAS code of conduct, and "numerous other concerns provided to the [c]ommittee over the past few seasons."

On July 11, Ma's attorney contacted USAS's General Counsel, Lucinda McRoberts, and requested that Ma's credentials be restored. McRoberts consulted Doug Everett, and then contacted Gagliardo and encouraged him to reinstate Ma's credentials. Gagliardo lifted Ma's suspension and cancelled the disciplinary hearing.

On July 12, 2018, the same day Ma's credentials were restored, Olympic Valley Swim Club hosted a summer league swim meet. Ma was volunteering as starter. That afternoon, PNS Official Brad Tucker learned from Gagliardo that the disciplinary hearing was cancelled and Ma had been reinstated. During the meet, Tucker, who was attending as a parent, stood up and began yelling at Ma. Tucker accused Ma of giving

an advantage to his team swimmers and alleged that Ma was not fit to be an official. Attendees found Tucker's behavior "egregious and inappropriate" and said they had "never before seen a parent treat a race volunteer or anyone else in this manner." One coach testified that Tucker's accusations against Ma were "unjustified and inaccurate." The outburst upset swimmers on both teams. While Tucker's behavior was reported to the PNS officials committee, no action was taken against Tucker.

Over the next few months, the PNS officials committee, including Tucker, with guidance from USAS, prepared and presented Ma a performance improvement plan (PIP). Ma repeatedly asked about the process and asked which senior PNS official would assess him based on concerns about the bias PNS officials had shown against him. Without answers, and believing he would have no chance to succeed under the plan, Ma transferred his registration to a different swimming club, Sierra Nevada.

In September 2019, Ma sued Gagliardo, asserting claims for violating the WLAD, defamation, tortious interference with contract, and negligent and intentional infliction of emotional distress. Ma later amended the complaint adding Rick Cox and Brad Tucker as defendants.[5]

In July 2021, the trial court granted Gagliardo's and Cox's motion for summary judgment and dismissed all claims against them.

Ma appeals.

II.

This is an appeal from an order granting summary judgment. Our review is de novo and we engage in the same inquiry as the trial court. Marquis v. City of Spokane,

---

[5] Tucker was later dismissed and is not a party to this appeal.

-10-

130 Wn.2d 97, 104-05, 922 P.2d 43 (1996).  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  CR 56(c); Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989).  The moving party bears the initial burden of showing the absence of an issue of material fact.  If the moving party meets this initial showing and is a defendant, the burden shifts to the plaintiff.  Young, 112 Wn.2d at 225.  While we construe the evidence and reasonable inferences in the light most favorable to the nonmoving party, if the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,'" summary judgment is proper.  Young, 112 Wn.2d at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The nonmoving party may not rely on speculation or bare assertions to create a material issue of fact.  Becker v. Wash. State Univ., 165 Wn. App. 235, 245, 266 P.3d 893 (2011).  "[M]ere allegations, denials, opinions, or conclusory statements" do not establish a genuine issue of material fact.  Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004).

We may affirm summary judgment on any basis supported by the record, "whether or not the argument was made below."  Bavand v. OneWest Bank, 196 Wn. App. 813, 825, 385 P.3d 233 (2016).

A.

Ma argues that the trial court erred in dismissing his discrimination claims under WLAD.  Ma claims that both the delay he experienced in obtaining his N1 referee certification and the later suspension of his credentials were discriminatory.  He

contends that there are disputes of material fact that precluded summary judgment. We agree.

"Summary judgment in favor of the employer in a discrimination case is often inappropriate because the evidence will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." Davis v. W. One Auto. Grp., 140 Wn. App. 449, 456, 166 P.3d 807 (2007). But if the "'record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred,'" summary judgment for the employer is proper. Becker, 165 Wn. App. at 252-53 (quoting Milligan v. Thompson, 110 Wn. App. 628, 637, 42 P.3d 418 (2002)). In the context of a workplace discrimination action, "the worker must do more than express an opinion or make conclusory statements," but "must establish specific and material facts to support each element of [their] prima facie case." Marquis, 130 Wn.2d at 105.

The WLAD makes it an unfair practice for an employer to discriminate against any person based on race. RCW 49.60.180(3).[6] To establish an employment discrimination case, Washington follows the burden allocation scheme set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Marquis, 130 Wn.2d at 113; Hines v. Todd Pac. Shipyards Corp., 127 Wn. App. 356, 370, 112 P.3d 522 (2005). The employee must first establish a prima facie case of

---

[6] While PNS is a voluntary organization and such claims are usually treated as public accommodation claims, the parties agree that the facts bear more of a resemblance to a claim for employment discrimination and we treat it accordingly.

discrimination, if they successfully do so, there is an inference of discrimination. Marquis, 130 Wn.2d at 114. The employer may rebut this inference by presenting evidence of a legitimate, nondiscriminatory reason for the adverse action. Marquis, 130 Wn.2d at 114. The burden then shifts back to the plaintiff to persuade the trier of fact that discrimination was a substantial factor in the disparate treatment. Marquis, 130 Wn.2d at 114. The plaintiff can meet this burden by showing that the employer's reason is pretext for discrimination by showing "(1) the employer's reasons have no basis in fact, (2) the employer was not actually motivated by the reasons, or (3) the reasons are insufficient to prompt the adverse employment decision." Becker, 165 Wn. App. at 252.

1.

To establish a prima facie case of employment discrimination, the plaintiff must show that they are a member of a protected class, that they were qualified or doing satisfactory work, that they suffered a tangible adverse employment action, and that the action occurred under circumstances that support a reasonable inference of unlawful discrimination. Marin v. King County, 194 Wn. App. 795, 808, 378 P.3d 203 (2016). A tangible adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

Ma argues that he was qualified to be certified as an official.[7] Ma presented evidence that he met PNS requirements for observation as a referee at the N1 level: Ma completed 16 novice sessions and was recommended for observation by 3 meet

---

[7] The parties do not dispute that Ma is a member of a protected class.

referees. Ma's novice records are filled with positive reviews and some constructive feedback.

Ma next argues that Gagliardo and Cox took adverse action against his officiating credentials. Ma contends that adverse action first occurred during his N1 referee certification process. This is so, Ma asserts, because Gagliardo and Cox controlled the certification process, which officials could perform observations, and which candidates were allowed to be observed. Gagliardo argues that he did not participate in observations, did not select which officials could perform observations, and because he was not chair of the Officials Committee until May 2016 he had nothing to do with Ma's certification process. Cox argues that each observation Ma failed was based on Ma's performance that day. These arguments ignore that: Gagliardo decided, without notifying Ma, that his first observation was only "educational"; the months of delay Ma experienced between his first and second observation; that eight other referees recommended that Ma be observed again during the interim; that Van Pool asked Cox and Gagliardo what to do when Ma asked for a second observation and both indicated Ma would not be observed again that year and that Ma "doesn't get it"; and that Cox maintained throughout that "there is no way [Ma] should ever become a referee."

Ma also contends that the suspension of his credentials was an adverse action because it was part of a broader course of conduct where defendants sought to prevent Ma from working as an official. Both Gagliardo and Cox argue that the temporary suspension of Ma's credentials does not amount to an adverse employment action, specifically because the committee's actions were disciplinary or investigatory. Kirby v. City of Tacoma, 124 Wn. App. 454, 465, 98 P.3d 827 (2004). Gagliardo and Cox argue

the committee had authority to take disciplinary action as a result of two SafeSport reports, violation of SMAC's code of conduct, and other concerns raised with the committee.

Finally, Ma presented evidence that he was treated differently than members outside of his class. When Ma was working towards certification, only 29 percent of all PNS officials were of Asian descent. Out of the 61 certified referees in PNS, only 3 were of Asian descent. Ma showed that only one other official, Vo, had to undertake a significant number of novice sessions in obtaining N1 certification and that other officials found this delay "unprecedented." Again, like Ma, Vo is of Asian descent. Ma also presented evidence that a white official, Cooney, whom PNS expressed reservations about, was certified on his first observation after 15 novice sessions.

Ma has raised genuine issues of material fact as to whether these actions constitute adverse employment actions. Taken in context, a jury could find that these actions, taken together, were materially adverse. Whether a particular action would be viewed as adverse by a reasonable employee is a question of fact appropriate for a jury. Boyd v. Dep't of Soc. and Health Servs., 187 Wn. App. 1, 13-14, 349 P.3d 864 (2015). Because the "'requisite degree of proof necessary to establish a prima facia case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence,'" the trial court erred by finding that Ma failed to establish a prima facie case of discrimination. Fulton v. Dep't of Soc. and Health Servs., 169 Wn. App. 137, 152, 279 P.3d 500 (2012) (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994)).

2.

Once the employee has made a prima facie showing, the employer "must present evidence that the plaintiff . . . was treated differently for a legitimate nondiscriminatory reason." Marquis, 130 Wn.2d at 114. Gagliardo argues that Ma's temporary suspension resulted from the committee's investigation into Ma that concluded he had repeatedly engaged in conduct unbecoming of an official. Cox argues that each time Ma was not recommended for advancement, the recommendation was based on Ma's performance at that particular observation, and that the decision to suspend Ma's credentials was based on credible information presented to the committee.

3.

When the employer presents evidence of a legitimate nondiscriminatory reason, the burden again shifts: the employee has the burden of proving that the employer's stated reasons are pretextual. An employee may raise a triable issue of pretext through evidence that an employer's deviation from established policy or practice worked to the plaintiff's disadvantage. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1117 (9th Cir. 2011).[8]

First, as for his N1 certification, Ma argues that Gagliardo and Cox required him to complete a significant amount of novice sessions, 58, significantly more than the 8 required by PNS rules. In addition, while Gagliardo argues that he was not involved in Ma's certification process and Cox asserts that Ma was impartially observed for

---

[8] Ma did not argue the pretextual prong in his brief. He did argue it below in opposition to summary judgment. For this proposition, Ma cited an unpublished case: Anderson v. Wal-Mart Stores, 2:16-cv-00072-SAB, 2017 WL 1960673, at *5 (W.D. Wash. May 11, 2017) (court order). Counsel for Ma also made this point at oral argument.

-16-

certification, Ma presented evidence that officials considered his first N1 observation "educational," both Cox and Gagliardo were communicating with officials between Ma's observations about a "path" Ma needed to go through, and that Cox was disparaging Ma's abilities.

Second, as for the temporary suspension, Ma presented evidence that he was only reported to SafeSport once, that the report was almost immediately rejected by SafeSport, and that the other concerns outlined by the committee were based on rumors and word-of-mouth. Gagliardo conceded that rumors would not support taking disciplinary action against Ma and yet Ma was suspended and then presented with a PIP. Ma presented a statement by Cox made after SafeSport rejected the report that "there are other ways to take care of this issue" referring to disciplining Ma. Ma also presented evidence that suspensions were meant not to be handled at the local level but by the National Board of Review or Zone Board of Review. In addition, Ma asserted that PNS was selective in who they chose to investigate, pointing to the incident with Tucker's outburst.[9] Thus, Ma has at least presented a genuine dispute of material fact on whether Gagliardo and Cox's actions were pretextual.

Based on the evidence presented, and viewing all the facts and the reasonable inferences favorably to Ma, the trial court erred in dismissing Ma's claim for discrimination under WLAD.

---

[9] At oral argument, counsel for Gagliardo asserted that PNS could not act against Tucker because PNS did not sponsor the event. But this also raises an issue of fact on whether PNS could not act against Tucker but could act against Ma based on alleged code of conduct violations.

B.

Ma argues the trial court erred in dismissing his defamation claim against Gagliardo. Ma claims that Gagliardo committed defamation by implication by stating that Ma had committed serious misconduct that twice was reported to SafeSport. While we agree that Ma presented sufficient evidence to support his claim that Gagliardo's statements were false by implication, Ma fails to offer proof of damages arising from the defamation. Summary judgment was appropriate.

Summary judgment serves as an early test of the plaintiff's evidence in a defamation case. Mark v. Seattle Times, 96 Wn.2d 473, 486-87, 635 P.2d 1081 (1981). To defeat a motion for summary judgment, the plaintiff "must establish a prima facie case by evidence of convincing clarity." Mark, 96 Wn.2d at 487. In a defamation claim, the plaintiff must establish (1) falsity, (2) damages, (3) fault, and (4) an unprivileged communication. Mark, 96 Wn.2d at 486 (citing RESTATEMENT (SECOND) OF TORTS § 558 (AM. L. INST. 1977)). In asserting defamation by implication or omission, the plaintiff must show that the communication left a false impression that would be contradicted by the inclusion of omitted facts. Mohr v. Grant, 153 Wn.2d 812, 827, 108 P.3d 768 (2005).

Ma argues that even the inference that he violated SafeSport implied that he was being investigated for committing conduct that implicated rules widely understood to protect children from sexual abuse. In support of his argument, Ma relies on Corey v. Pierce County, 154 Wn. App. 752, 225 P.3d 367 (2010). In Corey, a Pierce County prosecutor sued her former employer for defamation after the employer leaked to the press that the plaintiff was the subject of a pending criminal investigation. 154 Wn. App.

at 759.  However, at the time of the statement, the employer knew that an internal investigation had found there was no viable case to pursue against the plaintiff.  Corey, 154 Wn. App. at 758.  Thus, there was sufficient evidence of defamation to send the claim to the jury.  Corey, 154 Wn. App. at 764.

On July 7, 2018, Gagliardo sent Ma the notification of disciplinary action.  The notification was copied to the PNS chair and officials committee.  The notification first stated, "[t]he PNS Officials Committee has been notified of an allegation regarding actions taken by you earlier this year which were reported to the USA Swimming Center for Safe Sport."  (Emphasis added).  Ma asserts this statement was false—that he was never reported to SafeSport.  Instead, the first action, where Ma requested information on swimmers' dates of birth, was not reported to SafeSport but a U.S. Center for SafeSport contact was blind copied on an e-mail.  In the second action, over Ma's interaction with Zhang at the May Flowers meet, while it was reported to SafeSport, it was rejected the next day.  Gagliardo admitted to knowing that Matthes, who submitted the report to SafeSport, heard SafeSport declined to do anything but Gagliardo made no attempt to investigate more.  Thus, like in Corey, at the time of this statement Gagliardo knew that SafeSport had rejected the report against Ma.

Second, the July notification stated, "[t]his is in addition to numerous other concerns provided to the Committee over the past few seasons."  Gagliardo, however, admitted that those concerns were word-of-mouth, hearsay, and rumors.

Finally, the notification stated, "[m]ore recently, we have been notified of additional allegations wherein actions taken by you in recent weeks have violated a PNS team's Code of Conduct."  This correctly referred to the actions taken by SMAC

over Ma's interaction with Zhang at the May Flowers meet but incorrectly implied that the allegations were "additional" or different from the report to SafeSport. Ma offered evidence to support that Gagliardo's e-mail was false.

But a plaintiff in a defamation case must also prove damages. Mark, 96 Wn.2d at 486. While Ma presented evidence of damages related to the delay in certification and revocation of his certification, he offered no evidence of damages resulting from Gagliardo's defamatory statements.[10] Nor did Ma argue that he was damaged by the defamation either before the trial court or here. Because Ma failed to establish an essential element of his defamation claim—damages—summary judgment was proper. Young, 112 Wn.2d at 225.

C.

Ma argues the trial court erred in dismissing his tortious interference with contract claim. We agree.

A party claiming tortious interference with a contractual relationship or business expectancy must prove five elements:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 157, 930 P.2d 288 (1997).

---

[10] In his declaration, Ma explained that: he suffered emotional stress including waking up thinking about what he could have done better to be certified in April 2016; that his children were mistreated; that he had to work additional hours to obtain his certification; that his advancement as an official was delayed because of the delay in certification; and that he incurred legal costs to restore his credentials. He does not attribute damages to the defamation.

At the outset, we agree with Ma that his relationship as an official with USAS is a contractual relationship. Spokoiny v. Wash. State Youth Soccer Ass'n, 128 Wn. App. 794, 801, 117 P.3d 1141 (2005) (relationship between coach and soccer association was contractual). Nor is there any dispute that the parties were aware of the relationship between Ma and USAS. We turn then to the third element—whether Ma presented evidence of an intentional interference by Gagliardo or Cox leading to a breach of Ma's relationship or expectancy.

Ma contends that the trial court dismissed his tortious interference claim because his relationship as an official had not been terminated. Instead, Ma argues, that his claim was based on Gagliardo and Cox interfering with the substantive rights and procedural protections afforded under USAS rules. Ma argues that Gagliardo and Cox interfered with his rights under USAS rules by (1) subjecting him to race based discrimination, (2) working to prevent him from officiating at USAS competitions, (3) causing his membership to be suspended without authority and in violation of the due process protections under the rules.

The corporate bylaws of USAS provide: "It is the intent and purpose of USA Swimming to provide an equal opportunity to eligible . . . officials to participate in athletic competition within its jurisdiction, without discrimination on the basis of race, color, religion, age, gender disability, or national origin." In addition, the USAS regulations establish due process protections, including requirements for bringing complaints, investigations, notice, hearings, and appeals. As discussed above, Ma has offered evidence that creates a dispute of material fact over whether Gagliardo and Cox's

conduct was discriminatory, or violated the due process requirements set out in the USAS bylaws and regulations.

The trial court erred in dismissing Ma's claim for tortious interference with contract on summary judgment.

D.

Ma argues that the trial court erred in dismissing his claim for outrage after concluding that his allegations did not rise to the level of extreme and outrageous conduct. We disagree.

To establish outrage, the plaintiff must show (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) resulting severe emotional distress. Dicomes v. State, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Grimsby v. Samson, 85 Wn.2d 52, 59, 530 P.2d 291 (1975). First, the court must determine whether reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability. Dicomes, 113 Wn.2d at 630. The tort does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Kloepfel v. Bokor, 149 Wn.2d 192, 196, 66 P.3d 630 (2003).

Ma argues that the defendants[11] made knowingly false and misleading statements that were "tantamount to alleging [Ma] was alleged to have engaged in

---

[11] While Ma asserted this claim against both Gagliardo and Cox, Ma only cites "statements which implied that [Ma] had violated or was being investigated for violating SafeSport rules." The only

criminal sexual conduct towards a minor." In support, Ma again relies on Corey. 154 Wn. App. at 764. Corey presented evidence that her employer had publicly accused her of criminal behavior despite knowledge that an internal investigation revealed little of substance, and implied that she mishandled public funds. Corey, 154 Wn. App. at 764. Because Corey was a longtime public servant, the allegations went beyond mere insults and indignities. Corey, 154 Wn. App. at 764.

Here, the record does not support Ma's claim that Gagliardo and Cox alleged that Ma engaged in criminal sexual conduct. Instead, Gagliardo reported the fact that Ma had been reported to SafeSport as one piece of information the officials committee would consider at Ma's disciplinary hearing. Unlike in Corey, this information was only distributed to Ma and the officials committee, not the public.

Because reasonable minds could not differ on whether the conduct was extreme and outrageous, dismissal of Ma's claim for intentional infliction of emotional distress was appropriate.

F.

Ma argues that the trial court erred in dismissing his civil conspiracy claim because he presented evidence that Gagliardo and Cox openly discussed a coordinated effort to block Ma's referee certification, unlawfully suspend his credentials, and drive Ma from PNS. We disagree.

To establish a civil conspiracy, the plaintiff must prove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful

---

statement that meets this criterion is the notification from Gagliardo that Ma's credentials would be temporarily suspended pending a disciplinary hearing.

purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy. All Star Gas, Inc. of Wash. v. Bechard, 100 Wn. App. 732, 740, 998 P.2d 367 (2000). "Mere suspicion or commonality of interests is insufficient to prove a conspiracy." Wilson v. State, 84 Wn. App. 332, 351, 929 P.2d 448 (1996). "The test of the sufficiency of the evidence to prove a conspiracy is that the circumstances must be inconsistent with a lawful or honest purpose and reasonably consistent only with the existence of the conspiracy." John Davis & Co. v. Cedar Glen No. Four, Inc., 75 Wn.2d 214, 224, 450 P.2d 166 (1969).

Ma failed to establish that Gagliardo and Cox conspired against him. Both Gagliardo and Cox were members of the PNS Officials Committee and were responsible for recruiting, training, certifying, evaluating, recertifying, and supervising officials for PNS. Communications between Gagliardo and Cox, and other PNS officials, are consistent with the purpose of executing their duties as PNS Officials. Because Ma did not establish clear, cogent, and convincing evidence that Gagliardo and Cox conspired for an unlawful purpose, dismissal of Ma's civil conspiracy claim was appropriate.

We reverse the trial court's decision dismissing Ma's claims under the WLAD and for tortious interference with contract. We otherwise affirm.

WE CONCUR:

_Mann, J._

_Smith, A.C.J._                    _Andrus, C.J._